UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

STACEY SUE BERLINGER, aka
Stacey Berlinger O'Connor,
BRIAN BRUCE BERLINGER, and
HEATHER ANNE BERLINGER, as
Beneficiaries to the Rosa B.
Schweiker Trust and all of
its related trusts,

       Plaintiffs,

v.                                        Case No: 2:11-cv-459-FtM-29CM

WELLS  FARGO,  N.A.  AS
SUCCESSOR TO WACHOVIA BANK,
N.A., as Corporate Trustee
to the Rosa B. Schweiker
Trust,  and  all  of  its
related trusts,

       Defendant/Third
       Party Plaintiff

v.

BRUCE D. BERLINGER and SUE
CASSELBERRY,

       Third Party Defendants.

---

## OPINION AND ORDER

This matter came before the Court on February 2 through 5, 2016, for a bench trial of the remaining portions of plaintiffs' Second Amended Complaint. The Court heard testimony from John A. Rodgers, Charles Kelly, David Andruczyk, Linda J. LaVay (by deposition), Clyde C. Quinby, Richard J. Kemp, Keith Tiesta, and

William C. Reis.   The Court also received a number of exhibits from both sides, and heard arguments from counsel.

The litigation involves three family trusts: the Rosa B. Schweiker Family Trust, the Frederick W. Berlinger Family Trust, and the Rose S. Berlinger Family Trust (collectively the Berlinger Trusts), each discussed in greater detail below.  Plaintiffs Stacey Sue Berlinger (Stacey), Brian Bruce Berlinger (Brian), and Heather Anne Berlinger (Heather) (collectively plaintiffs) are the children of Bruce D. Berlinger (Bruce) and Sue Casselberry (Sue). Wachovia Bank, N.A. (Wachovia Bank) acted as the corporate co-trustee for the Berlinger Trusts in 2007, 2008, 2009, and part of 2010.  On March 20, 2010, Wachovia Bank merged with and into Wells Fargo, N.A. (Wells Fargo), and Wells Fargo served as corporate co-trustee for the three Berlinger Trusts for the remaining part of 2010 until March, 2011.  For purposes of this Opinion and Order, the Court will refer to Wachovia Bank and Wells Fargo interchangeably.

In their Second Amended Complaint (Doc. #93) plaintiffs assert they are present beneficiaries of the Berlinger Trusts, and assert claims of breach of trust (Count I), breach of fiduciary duty (Count II), and civil theft (Count III) against Wells Fargo as the former corporate trustee of the Berlinger Trusts.  More specifically, plaintiffs assert in Counts I and II that Wachovia Bank violated its duties as corporate trustee in three areas:  (1)

2

making distributions of principal and/or income to Bruce from the Berlinger Trusts which were used by Bruce to pay his alimony obligations to Sue; (2) authorizing the Rosa Trust to purchase a one-third interest in certain residential property for $2 million as a trust investment and paying about $250,000 for capital improvements to the property; and (3) failing to diversify Berlinger Trust assets and abusing its discretion in its investment decision-making as to Berlinger Trusts assets.

The Court dismissed Count III in a previous Order (Doc. #220) for lack of standing and failure to state a claim. The Court granted summary judgment in favor of Wells Fargo as to the first and third aspect of Counts I and II (Doc. #492), and this non-jury trial was held as to the second aspect of the Second Amended Complaint.

The Court makes the findings of facts and conclusions of law set forth below.

## I.

Various family trusts for four generations of the Berlinger family, going back to 1961, provide the background for the remaining issues in this case. The relevant family tree looks something like this:



The relevant family trusts are described below.  The remaining issues to be decided involve conduct relating solely to the Rosa B. Schweiker Will and Resulting Trust (the Rosa Trust).  Specifically, the issues before the Court are whether Wells Fargo breached the Florida prudent investor rule when it allowed the Rosa Trust to invest $2 million in the Banyan Property in return for a one-third ownership interest, and/or when it allowed the Rosa Trust to pay approximately $290,000 for capital improvements to the Banyan Property.

## A.    Rosa B. Schweiker Will And Resulting Trust

On February 2, 1961, Rosa B. Schweiker (Rosa) signed a will, Defendant's Exhibit 48, Plaintiffs' Exhibit 1, which provided that all her tangible personality other than currency be given to her

daughter, Rose S. Berlinger, and provided a token cash amount to another individual.  (Id. at §§ 1-2.)  The residue of Rosa's estate was to be given to her trustees, in trust (the Rosa Trust).  (Id. at § 3.)  During Rose's life, the corporate trustee was to pay the Trust income "to such of my daughter [Rose] and her issue as my corporate trustee selects and in such proportion as it determines without being required to maintain equality among them . . . ."  (Id.)  The provision continued that "my corporate trustee shall bear in mind, in allocating income from time to time among my daughter and her issues, that my daughter is the primary object of my bounty and that it is my intention that it shall not be charged with an abuse of its discretion should it pay all of the income to my daughter."  (Id.)

The Rosa Trust further provided that upon Rose's death the corporate trustee was to pay the principal of the trust as Rose directed by express reference in her will.  If there was no such express provision in Rose's will, the trustee was to hold all principal in trust in accordance with certain instructions:  During the life of Bruce Berlinger (Rosa's grandson and Rose's son), the trustee was to pay income from the principal "to such of my grandson and his issue as my corporate trustee selects and in such proportion as it determines without being required to maintain equality among my grandson and his issue, . . . ."  (Id.)  The provision continued, stating that "my corporate trustee shall bear

in mind, in allocating income from time to time among my grandson and his issues, that after the death of my daughter my grandson will be the primary object of my bounty and that it is my intention that it shall not be charged with an abuse of its discretion should it pay all of the income to my grandson." (Id.)

Among other powers, the Rosa Trust allowed the corporate trustee to invade the principal:  "To apply for the benefit of a beneficiary, in such manner as my corporate fiduciary deems appropriate, as much of the principal, the income of which it has authority to pay to the beneficiary or to the income of which the beneficiary is entitled, as, without considering the beneficiary's individual property, it determines is required for his comfortable maintenance . . . ."  (Id. at § 6(f).)  During Rose's lifetime this invasion of principal was restricted as follows:  "[T]he principal shall not be invaded for the benefit of a beneficiary other than my daughter unless my daughter is incapable in my corporate fiduciary's judgment of managing her own affairs and then only for the purpose of enabling such other beneficiary to meet an emergency, such as illness, for the meeting of which funds of his own of a substantial nature are not reasonably available." (Id.)  The invasion of principal was also restricted after Rose's death:  "My corporate trustee shall be similarly guided as to invasion of principal after the death of my daughter and during the life of my grandson should a question then arise as to invasion

of principal for the benefit of a beneficiary other than my grandson." (Id.)

As to investments, the Rosa Trust provided that the Trustee had the additional power "to retain any property and to purchase such real or personal property as they select without being confined to investments legal for trustees and without being under any obligation to diversify investments, to minimize risk, or to produce income . . . ." (Id. at § 6(a).)

The Rosa Trust further directed "[t]hat interests of beneficiaries shall not be subject to anticipation or to voluntary or involuntary alienation, and the protection afforded by this paragraph shall be effective both as to principal and income until actual payment to the beneficiary." (Id. at § 4.) Further, the discretions conferred relating to the allocation of income among beneficiaries, allocations of receipts and disbursements between principal and income, and invasion of principal "shall not be exercised by an individual fiduciary who can derive direct or indict benefit from such exercise." (Id. at § 6.)

**B.    Frederick W. Berlinger Deed of Trust**

Frederick W. Berlinger (Frederick) was the husband of Rose Berlinger and the father of Bruce Berlinger.  In December, 1988, Frederick transferred certain property to a corporate trustee and himself as trustees to hold in trust according to certain provisions which created three trusts (the Frederick Trust).

7

Plaintiffs' Exhibit 2; Defendant's Exhibit 2.  First, a Lifetime Trust was created for the benefit of Frederick which was essentially under the complete control of Frederick.  (Id. at § I.)  Second, a Family Trust was to be created after Frederick's death, when the corporate trustee was to set aside $1 million in a separate trust.  (Id. at § II.)  Under this Family Trust, if Frederick's wife Rose survived Frederick, the separate trust was for the primary benefit of Rose.  (Id. at § II.A.)  The Family Trust provided that after the deaths of both Rose and Frederick, "[a]s much of the net income and the principal as my trustee, in my trustee's sole discretion, may from time to time think desirable shall be distributed to such one or more of my descendants in such amounts or proportions as my trustee may from time to time think appropriate . . . ."  (Id. at § II.B.1.)  The trustee was not required to treat the beneficiaries equally or proportionally with regard to income distributions from the trust.  (Id. at § II.B.)

Third, after Frederick's death a Marital Deduction Trust was to be created from the balance of the principal.  (Id. at § III.) If Rose survived Frederick, the net income from this Marital Deduction Trust was to be paid to her in installments, along with as much principal as the trustee determined was desirable for Rose's "health, support or maintenance."  (Id. at § III.A.)  After Rose's death, the principal was to be used to pay any increase in death taxes or administration expenses in Rose's estate caused by

an inclusion of a portion of the Marital Deduction Trust.  (Id.)
The balance of the principal would be paid to one or more of
Frederick's descendants on terms Rose appointed by a will, or in
the absence of such a valid will provision, was to be held by the
trustee subject to certain instructions.  (Id. at § III.B.)

## C. Rose S. Berlinger Revocable Deed of Trust

On October 17, 1991, Rose S. Berlinger established a Revocable
Deed of Trust, which was restated on September 19, 2002,
subsequently amended, and finally restated in its entirety on
October 18, 2002.  Plaintiffs' Exhibit 3; Defendant's Exhibit 1.
The Deed of Trust created a Living Trust in which the income was
distributed to Rose during her lifetime.  Upon Rose's death
(October 28, 2002[1]), the trustee was to pay the expenses of the
last illness, funeral expenses, Rose's debts, and death taxes from
the trust principal.  The balance of the trust estate was to be
held by the trustee as the Rose S. Berlinger Family Trust (the
Rose Trust).  This trust provided a lifetime benefit of $200 per
week to one of Rose's employees.  The balance of the net income
was to be distributed to Bruce, his children and his more remote
descendants, in equal or unequal proportions, at such times as the
trustee deems to be in the best interest of such beneficiaries
after considering their needs, other income, resources, means of

---

[1] Defendant's Exhibit 49, p. WF/BER 01743, ¶ E.

support and any other pertinent circumstances and factors.   The trustee was to distribute so much or all of the principal to Bruce if it was necessary for his support or health in his accustomed manner of living after considering his other income and resources. Under no circumstances was there to be any distribution of principal to Bruce for any purpose other than his health or support in his accustomed manner of living.   The determination of whether any distribution of principal should occur was to be made exclusively by the trustee.   Additionally, the trustee could distribute so much or all of the principal to or for the benefit of Bruce's children as the trustee in its sole and absolute discretion deemed appropriate for the support, health, education, and general welfare, in equal or unequal amounts after considering their needs, other income, resources, means of support and any other pertinent circumstances and factors.

## II.

On September 23, 1978, Rosa's grandson Bruce Berlinger married Sue C. Casselberry in Orlando, Florida.   Defendant's Exhibit 51, ¶ 1.1; Defendant's Exhibit 79.   Three children were born of this marriage, those being plaintiffs Stacey, Brian, and Heather Berlinger.   Defendant's Exhibit 51, ¶ 2.1.

During their marriage, Bruce and Sue became the owners of residential property located on Banyan Blvd., Naples, Florida. While the street address has changed over time, the property

consists of two and one-half lots on a small lake in the Coquina Sands neighborhood. This is an older, up-scale neighborhood in which older homes are often sold simply to be torn down and replaced with a larger residence. Lot 69 and the western half of lot 70 are approximately 35,000 square feet and have a two-story, 5 bedroom house with 4,950 square foot of gross living space ("square feet under air"). Lot 68 is an adjoining vacant lake-front lot of approximately 20,100 square feet. The Court's references to the "Banyan Property" includes all of these lots, the house, and the appurtenances.

## A. Divorce Proceedings

Sue and Bruce began divorce proceedings in Collier County Circuit Court in December, 2003. Defendant's Exhibit 79, ¶4. The Banyan Property was owned by Bruce and Sue as tenants by the entireties, and was part of the marital assets involved in the divorce proceedings.

After more than three years in divorce proceedings, the parties began to resolve their property disputes. A special magistrate conducted an evidentiary hearing on August 20, 2007, regarding a variety of disputed personal property, and issued a Report, Recommendation, and Proposed Order on September 6, 2007. Defendant's Exhibit 49. Mediation ultimately resulted in an additional Marital Settlement Agreement, discussed below,  and

both were incorporated into a final judgment in the divorce proceedings.  Defendants Exhibit 51.

**B. Appraisals of Banyan Property**

As part of the ongoing mediation process, on September 11, 2007, Bruce's divorce attorneys retained the services of licensed real estate appraiser and broker Clyde C. Quinby (Mr. Quinby). Plaintiffs' Exhibit 260.  Mr. Quinby was tasked with preparing separate appraisals for (1) the lot and a-half with the house, and (2) the adjoining lot.   Id.

After about six hours work, Mr. Quinby determined on September 11, 2007, that the total fair market value of the Banyan Property was $6,675,000.  Mr. Quinby prepared a written appraisal dated September 13, 2007, stating the fair market value of the vacant lot was $1.74 million based upon the sales comparison approach. Defendant's Exhibit 47.  Mr. Quinby prepared a written appraisal dated September 14, 2007, stating the fair market value of the lots with the house was $4,935,000 based upon the sales comparison approach.  Defendants' Exhibit 46.  Both appraisals identified Bruce's divorce attorneys as the client, and noted that the intended purpose was "[t]o assist the client with arriving at a conclusion of fair market value for the possible dissolution of marriage purposes." Id.  Boilerplate provisions intended to shield Mr. Quinby from liability to others provided that no one other than the client could rely upon the appraisals.  Id.  Other than

knowing the appraisals were for use in the divorce proceedings, Mr. Quinby had no information regarding the divorce proceeding itself, how the appraisals would be used in the divorce proceeding, or the contents of any potential settlement.

## C. Bruce's Initial Discussions With Wachovia Bank

In furtherance of the mediation process, Bruce engaged in conversations with Wachovia Bank trust officials concerning possible funding of any settlement agreement. In about September, 2007, Bruce had discussions with Sheryl Mackey (Ms. Mackey), a Managing Director at Wachovia Bank, regarding access to Berlinger Trust assets. Ms. Mackey in turn discussed the matter with David Andruczyk (Mr. Andruczyk), a Trust Real Estate Advisor at Wachovia Bank.

On September 11, 2007, Mr. Andruczyk conducted an exterior "drive by" inspection of the Banyan Property to ensure that the trust asset actually existed. Plaintiffs' Exhibit 104; Defendant's Exhibit 10. Back on August 21, 2007, Mr. Andruczyk had informed Bruce that he would be making his annual inspection of the Trust properties on September 11, 2007, and asked Bruce to meet him there. Defendant's Exhibit 29. Mr. Andruczyk believes Bruce was at the inspection. Mr. Andruczyk's "Inspection For Residential Properties" report noted that the value of the Banyan Property is $6,675,000. Plaintiffs' Exhibit 104; Defendant's Exhibit 10. While Mr. Andruczyk could not remember the source of

this valuation, it is clear to the Court that the value was based upon Mr. Quinby's two appraisals.  No interior examination was conducted, although a notation stated "interior inspection scheduled for Sept. 2008."  <u>Id.</u>  On September 14, 2007, Mr. Andruczyk and Ms. LaVay had discussions with Bruce and others concerning access to assets in the Berlinger Trusts. Defendant's Exhibit 38.  Conversations among Wachovia Bank officials, and between Wachovia Bank officials and Bruce and his representatives, continued after the execution of a marital settlement agreement, discussed below.

**D. The Marital Settlement Agreement (MSA)**

Bruce and Sue each signed a Marital Settlement Agreement (the MSA) on September 15, 2007, Defendant's Exhibit 49.  The MSA was intended to resolve all issues between the couple, and was irrevocable.  (<u>Id.</u>, ¶¶ 1.3, 1.5, 1.6, 1.7.)  The parties recognized that the MSA was reached at a mediation conference and agreed to be bound by its terms.  (<u>Id.</u>, ¶ 10.1.)  Each of the parties further acknowledged "that the settlement terms reflected in this Agreement represent a compromise and negotiated settlement."  (<u>Id.</u> ¶ 12.7.)

The financial components of the MSA provided Sue with alimony (<u>Id.</u> ¶¶ 3.1 – 3.7), a property settlement (<u>Id.</u> ¶¶ 4.1 – 4.9), and an equalizer payment (<u>Id.</u> ¶¶ 4.5.)  Sue was provided permanent

alimony of $16,000 per month, which terminated upon the death of either Bruce or Sue or the remarriage of Sue (Id. ¶¶ 3.2-3.4.)

The property settlement provided in relevant part that the agreed-upon distribution of marital property was "fair and equitable between them" and was "in full and complete satisfaction of all marital rights in and to the marital property." (Id. ¶ 4.1.) Under the property settlement, Bruce would take all right, title and interest in the Banyan Property (Id. ¶¶ 4.2.1, 4.2.2); all stock in a certain company (Id. ¶ 4.2.3); certain cash, funds on deposit, and stock, bonds, mutual funds and securities (Id. ¶¶4.2.4, 4.2.5, 4.2.6); an IRA (Id. ¶ 4.2.7); a certain Note receivable (Id. ¶ 4.2.8); certain personal property (Id. ¶¶ 4.2.9, 4.6); motor vehicles in his name (Id. ¶ 4.2.10); a federal tax passive activity loss carryover (Id. ¶ 4.2.11); and credit card or other debt in his name (Id. ¶ 4.2.12). Under the property settlement, Sue would take all right, title and interest in certain cash and funds on deposit (Id. ¶¶4.3.1, 4.3.2, 4.2.6); an IRA (Id. ¶ 4.3.3); a certain motor vehicle (Id. ¶ 4.3.4); a certain Mortgage and Note receivable (Id. ¶4.3.5); all of her accounts or debts at or with Northern Trust Bank (Id. ¶ 4.3.6); certain personal property (Id. ¶¶ 4.3.7, 4.6); and credit card or other debt in her name (Id. ¶ 4.3.8).

Also included in the property settlement was an Equitable Distribution Payment. (Id. ¶ 4.5). "In order to accomplish an

equitable distribution of the marital assets," Bruce was required to pay Sue a lump sum of $2 million in three scheduled payments: (1) $300,000 within thirty days (i.e., October 15, 2007); (2) $1.4 million within 60 days (i.e., November 15, 2007) and (3) $300,000 upon Sue's completion of certain conditions relating to vacating the Banyan Property[2] and the payment of certain financial obligations. (Id. ¶ 4.5a-c.) Bruce and Sue further agreed that Sue would transfer title to the Banyan Property by quit claim deed to Bruce as sole owner in fee simple absolute no later than the day before closing of any loan Bruce required to make either the first $300,000 payment or the $1.4 million payment. (Id. ¶ 4.8.) The MSA provided that "[t]his [Equitable Distribution] payment is intended to be a tax-free interspousal transfer related to the cessation of marriage to effect a division of marital property under Internal Revenue Code section 1041 and comparable provisions of state law." (Id. ¶ 4.5.1.)

The parties represented to the state court that the settlement agreement was fair and was signed freely and voluntarily. Defendant's Exhibit 79. The MSA was incorporated into a final judgment of divorce filed in the Collier County Circuit Court on November 21, 2007. Defendant's Exhibit 51.

---

[2] Sue was entitled to exclusive use of the Banyan Property until December 1, 2007. (Id. ¶ 4.8g.)

**E. Bruce's Funding of Marital Settlement Agreement**

Having executed the mediated MSA on September 15, 2007, Bruce was obligated to meet the financial obligations to Sue in a relatively short time frame. Wachovia Bank officials continued preliminary discussions of Bruce's initial proposal for funding of his obligations under the MSA.

In a September 19, 2007 1:35 p.m. email, Mr. Andruczyk advised Ms. LaVay and three other Wachovia Bank officials that he had given much thought to his conversation with Ms. LaVay on September 14 about the Berlinger divorce settlement. Plaintiffs' Exhibit 124E; Defendant's Exhibit 38. Mr. Andruczyk stated that it was his understanding that Bruce wanted the Trust to purchase a 1/2 interest of his jointly held home from his soon-to-be ex-wife for $2 million; and that the Trust would then hold the home in trust until there was an upswing in the real estate market, at which point the home would be sold. Id. Ms. LaVay had stated the Trust would hold a 1/3 interest in the house, which was currently valued at $6 million, prompting three "questions and concerns" by Mr. Andruczyk: (1) Shouldn't the Trust be a 1/2 owner of the Banyan Property, not a 1/3 owner, regardless of the current market value? (2) Would the charitable remainder beneficiaries someday question

the purchase if there is no profit to be gained?[3] And (3) Since Bruce intended to live in the Banyan Property, would the Trust move forward with the sale of the condominiums or lease them until the market improves?  Id.

Ms. LaVay's email responses of September 20, 2007, chastised Mr. Andruczyk for sending his email before Wachovia Bank had made a final decision, advised that the Trust would "NOT" be purchasing the wife's interest in the property, and stated that she (Ms. LaVay) had simply been presenting all of the options at the mediation.  Plaintiffs' Exhibit 124E; Defendant's Exhibit 38.  Ms. Mackey and Keith Tiesta, the Vice President and Senior Real Estate Advisor at Wachovia Bank, agreed that the legal department needed to be involved in the decision making process, Id., which was done.

As Wachovia Bank was mulling over funding options, Bruce retained attorney Charles Kelly and his law firm (Kelly, Passidomo, & Alba, LLP) to assist in obtaining the funding.  Mr. Kelly examined the various Berlinger Trusts with an eye toward determining which were accessible for possible funding of Bruce's MSA obligations.  Mr. Kelly considered three possible scenarios: (1) a discretionary distribution to Bruce from one of the Berlinger

---

[3]In fact, the Rosa Trust had not charitable remainder beneficiaries.

Trusts; (2) or a loan from the Trusts; or (3) a transaction with one of the Berlinger Trusts.

In an October 9, 2007, letter to Ms. LaVay, Mr. Kelly wrote that he had recently began representing Bruce individually in his dual capacities as co-trustee and beneficiary of the Berlinger Trusts. Plaintiffs' Exhibit 94; Defendant's Exhibit 22. Mr. Kelly stated that in light of the recent divorce settlement Bruce needed $2.1 million to satisfy the "equalizer" payment required by the MSA. Id. Mr. Kelly suggested that the Rose Trust may be the best source for Bruce to obtain the needed funds, but alternatively suggested a loan of $2.1 million from the Rose Trust or a combination of the Rose Trust and the Rosa Trust. Id.

Mr. Kelly had conversations with Ms. LaVay about his proposals, which were ultimately rejected by Wachovia Bank. Wachovia Bank instead suggested a transaction in which the Rosa Trust purchase an interest in the Banyan Property for $2 million. In an October 28, 2007, letter to Ms. LaVay, Mr. Kelly wrote that Bruce, "considering the lack of alternatives," would like to proceed with the option suggested by Wachovia Bank of a purchase of a $2 million interest in Bruce's residence. Plaintiffs' Exhibit 94; Defendant's Exhibit 22. Bruce requested the right to repurchase the $2 million share at a price which would result in a 7% rate of return for the trusts. Id.

Wachovia Bank obtain a title insurance commitment for the Banyan Property.  Effective October 29, 2007, Attorneys' Title Insurance Fund, Inc. issued a $2 million title Commitment on the Banyan Property to Wachovia Bank and Bruce as co-trustees of the Rosa Trust.  Plaintiffs' Exhibit 99; Defendant's Exhibit 8.  The Commitment was subject to certain requirements found in Schedule B-1.  Id.

In a November 2, 2007 11:34 a.m. email, Mr. Andruczyk told Ms. La Vay that it appeared from his conversation with Mr. Tieste that Wachovia Bank would accept partial ownership of the Banyan Property.  Plaintiffs' Exhibit 116; Defendant's Exhibit 14.  Mr. Andruczy requested copies of certain needed documents.  Id.  The documents, including an appraisal for the lots with the house on the Banyan Property were sent to Mr. Andruczyk on Novenber 5, 2007. Defendant's Exhibit 39.

In a November 2, 2007 12:50 p.m. email, Mr. Andruczyk introduced himself to Kathleen Passidomo, one of Bruce's attorneys, as the Trust Real Estate Officer assigned to assist Linda LaVay with the acceptance and acquisition of the Banyon Property for the benefit of Bruce.  Plaintiffs' Exhibit 115; Defendant's Exhibit 13.  Mr. Andruczyk stated that it was his understanding that the trustees of the Rosa Trust would purchase a 1/3 share of the ownership from Sue, resulting in the new ownership being 1/3 owned by the Rosa Trust and 2/3 owned by Bruce.

Id.   Mr. Andruczyk appeared to believe (incorrectly) that the initial plan was to pay Sue directly for her interest in the Banyan Property.   Id.

On November 5, 2007, Mr. Andruczyk sent emails discussing the percentage ownership the Rosa Trust would receive for its $2 million investment.  Mr. Andruczyk initially relied upon just the appraisal for the lots with the house, but ultimately discovered he had not considered the appraisal for the vacant lot, which was a component of the Banyan Property.  Defendant's Exhibits 12, 39. Mr. Andruczyk was given the second appraisal, and recalculated the fair value of the Banyan Property.  Defendant's Exhibit 41.

In a November 8, 2007 email, Mr. Andruczyk noted that given the appraised value of the home of $6,675.000 and the $750,000 outstanding mortgage owed by Bruce, the $2 million to be taken from the Rosa Trust would purchase a 34% share of the Banyan Property.  Plaintiffs' Exhibits 89, 108; Defendant's Exhibits 4, 40.  He also noted that as fiduciary Wachovia Bank would require a title insurance policy.  Defendant's Exhibit 12.  Wachovia Bank determined that the transaction paperwork should reflect a 1/3 interest to the Rosa Trust.  Plaintiffs' Exhibit 113; Defendant's Exhibit 41.  On November 14, 2007, the appropriate internal Wachovia Bank committee approved the acquisition of the one-third interest in the Banyan Property with the understanding that the

Rosa Trust would share profits when the Banyan Property was sold. Defendant's Exhibit 43.[4]

On November 14, 2007, just prior to the closing, there were emails suggesting that the insurance company wanted another appraisal of the Banyan Property. Plaintiffs' Exhibit 112; Defendant's Exhibit 64. Bruce implored Wachovia Bank to explain to the insurance company that he had had two recent appraisals done and was not interested in paying for a third one. Id. Wachovia Bank did not order a new appraisal, and it appears the insurance company agreed to accept the existing appraisals.

The closing transactions were on November 15, 2007. Plaintiffs' Exhibits 98B, 98C. Sue and Bruce conveyed their undivided entireties interest in the Banyan Property to Bruce pursuant to the terms of the MSA by Warranty Deed. Plaintiffs' Exhibit 124A. In exchange for $2 million, Bruce conveyed an undivided 1/3 interest in the Banyan Property by Warranty Deed dated November 9, 2007 (which had been held in escrow), to the Rosa Trust. Plaintiffs' Exhibit 123A; Defendant's Exhibits 44, 54. The $2 million was transferred to Bruce from principal in the Rosa Trust. Defendant's Exhibit 44. Bruce approved a Disbursement Authorization, Defendant's Exhibit 7, authorizing his attorneys

---

[4] Mr. Andruczyk make an error when he typed this form, writing that the Rosa Trust was buying the interest from Sue, when the Rosa Trust was actually buying the interest from Bruce.

Kelly, Passidomo & Alba, LLP, to release the total net sales proceeds of $1,959,257.46, with $1.4 million to be disbursed to Sue, $302,757.97 to be disbursed to Wachovia Bank to repay the loan Bruce had obtained to make his first $300,000 payment to Sue, and $256,499.49 to Bruce.  On November 16, 2007, the law firm of Kelly Passidomo Alba & Cassner, LLP wired $1.4 million to Sue from the Orion Bank.  Defendant's Exhibit 81.

Effective November 21, 2007, the Attorneys' Title Insurance Fund, Inc. issued a title insurance policy in the amount of $2 million to the Rosa Trust on the Banyan Property.  Defendant's Exhibit 94.  Bruce and Sue's Warranty Deed to Bruce was recorded in the Collier County Public Records on November 21, 2007, at 12:08 p.m.  Plaintiffs' Exhibit 124A.  Bruce's Warranty Deed to the Rosa Trust was thereafter recorded in the Collier County Public Records on the same date at 12:08 p.m.  Defendant's Exhibit 54.

Once Wachovia Bank received the title insurance and the recorded deeds, it "booked" the asset, although the purchase of the 1/3 interest in the Banyan Property was initially mis-booked on the Wachovia account for the Rosa Trust by the Trust Real Estate support team.  The December, 2007 Wachovia Trust Statement, Defendant's Exhibit 36, booked the asset at $666,666.67, mistakenly booking 1/3 of the $2 million instead of the full $2 million for the 1/3 interest.  Id. page 11. On January 30, 2008, a Trust Associate of Ms. LaVay advised Mr. Andruczyk that the value

23

of the Banyan Property had not been properly booked in at $2 million, and asked Mr. Andruczyk to adjust the records to reflect the full value of the home. Defendant's Exhibit 4. After the matter was researched, the Wachovia Trust Statement for February, 2008, and thereafter reflected the corrected market value of $2 million. Defendant's Exhibit 3, p. 11; Defendant's Exhibit 4; Defendant's Exhibit 5.

On January 11, 2008, Bruce made a formal request to Wachovia Bank that it consider all of his family's trust together when making distribution of income directly to Bruce. Plaintiffs' Exhibit 72; Defendant's Exhibit 65. He continued: "In so doing, please have income, when possible, unfairly distributed to me and for my sole benefit." Id. Bruce further stated that this was a blanket request which may be altered or modified in the future, but that with current pressures it would helpful for the re-alignment to take place. Id.

**F. Capital Improvements to Banyan Property**

After the closing, Bruce and Cabral Construction Inc. (Cabral Construction) entered into a $250,000 contract to make capital improvements on the Banyan Property. Cabral Construction had previously performed on a prior contract for construction work on two condominiums owned by the Rose S. Berlinger Trust. Plaintiffs' Exhibits 177A, 177B; Defendant's Exhibits 30, 31.

24

Wachovia Bank first heard of the construction at the Banyan Property in December, 2007. Plaintiffs' Exhibit 137; Defendant's Exhibit 55. Bruce informed Wachovia Bank on December 21, 2007, that he was getting the Banyan Property "'designer ready' for sale." Defendant's Exhibit 56. This prompted discussion at Wachovia Bank as to whether the Rosa Trust would be reimbursed for the cost of the improvements if the home was sold. Id. Ultimately, Wachovia Bank entered into a contract with Cabral Construction for the $250,000 improvements. Plaintiffs' Exhibit 124C. Cabral Construction sent its invoices for the capital improvement work to Mr. Andrucxyk at Wachovia Bank, who caused them to be paid directly to Cabral Construction from the Rosa Trust. Plaintiffs' Exhibit 105, 120, 135, 176, 180D; Defendant's Exhibits 11, 57, 69. Wachovia Bank paid a total of seven draws from the Rosa Trust, Plaintiffs' Exhibits 139X, 31C, 31E, 31F, 140D, which totaled $286,632.00.

| Exhibit Number | Draw Number | Amount of Draw |
|---|---|---|
| Plaintiffs' 139X | 1 | $37,032.00 |
| Plaintiffs' 31C | 2 | $58,481.00 |
| Plaintiffs' 31C | 3 | $52,470.00 |
| Plaintiffs' 31E | 4 | $53,011.00 |
| Plaintiffs' 31E | 5 | $29,515.00 |
| Plaintiffs' 31F | 6 | $20,009.00 |

| | | |
|---|---|---|
| Plaintiffs' 140D, 180D | 7 | $36,114.00 |
| Total | | $286,632.00 |

Cabral Construction provided the co-trustees of the Rosa Trust with an undated Notice To Owner, Plaintiffs' Exhibit 133; Defendant's Exhibit 21, noting that its work on the Banyan Property was complete. The final draw request was received by Wachovia Bank on September 8, 2008. Defendant's Exhibit 19. Bruce ultimately confirmed to Wachovia Bank that the work was completed and Wachovia Bank could go ahead and pay the final bill. Id. Bruce agreed that two-thirds of the costs would be credited back to the Rosa Trust when the Banyan Property sold. Plaintiffs' Exhibit 124C

### III.

The Florida Trust Code provides that "[u]pon acceptance of a trusteeship, the trustee shall administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries, and in accordance with this code." Fla. Stat. § 736.0801. "[A] violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust." Fla. Stat. § 736.1001(1). The elements of a claim for breach of trust or fiduciary duty under Florida law are: "(1) the existence of a fiduciary duty; (2) the breach of that duty; and (3) damage proximately caused by that

breach." Treco Int'l S.A. v. Kromka, 706 F. Supp. 2d 1283, 1288 (S.D. Fla. 2010). See also Gracey v. Eaker, 837 So. 2d 348, 353 (Fla. 2002) ("[t]he elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages."). Thus, to the extent they are based on the same conduct, plaintiffs' Count I claim for breach of fiduciary duty is redundant of the Count II claim for breach of trust.

The specific obligations of a trustee are found in the trust documents. "From the trust, the trustee derives the rule of his conduct, the extent and limit of his authority, the measure of his obligation." Jones v. First Nat'l Bank, 226 So. 2d 834, 835 (Fla. 4th DCA 1969); see also Fla. Stat. § 737.401. "[T]he trustee can properly exercise such powers and only such powers as (a) are conferred upon him in specific words by the terms of the trust, or (b) are necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust." Restatement (Second) of Trusts § 186 (1959); see also id. § 164; In re Celotex Corp., 487 F.3d 1320, 1328 (11th Cir. 2007). To determine the extent of a trustee's authority as defined by the trust instruments, the court independently interprets the terms of the trust documents. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 112 (1989) ("As they do with contractual provisions,

courts construe terms in trust agreements without deferring to either party's interpretation.").

Under Florida law, "[a] trustee shall administer the trust as a prudent person would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill and caution. Fla. Stat. § 736.0804. As a fiduciary, a trustee:

> has a duty to invest and manage investment assets as a prudent investor would considering the purposes, terms, distribution requirements, and other circumstances of the trust. This standard requires the exercise of reasonable care and caution and is to be applied to investments not in isolation, but in the context of the investment portfolio as a whole and as a part of an overall investment strategy that should incorporate risk and return objectives reasonably suitable to the trust, guardianship, or probate estate. If the fiduciary has special skills, or is named fiduciary on the basis of representations of special skills or expertise, the fiduciary is under a duty to use those skills.

Fla. Stat. § 518.11(1)(a). Additionally, "[t]he fiduciary's investment decisions and actions are to be judged in terms of the fiduciary's reasonable business judgment regarding the anticipated effect on the investment portfolio as a whole under the facts and circumstances prevailing at the time of the decision or action. The prudent investor rule is a test of conduct and not of resulting performance." § 518.11(1)(b).

"A trustee has wide discretion in the exercise of his power and a court will not interfere unless he abuses his discretion." State of Del. ex rel. Gebelein v. Belin, 456 So. 2d 1237, 1241 (Fla. 1st DCA 1984).  "A trustee who acts in reasonable reliance on the terms of the trust as expressed in the trust instrument is not liable to a beneficiary for a breach of trust to the extent the breach resulted from the reliance."  Fla. Stat. § 736.1009.

**IV.**

**A. Preliminary Matters**

**(1)  Undisclosed Opinion of John A. Rodgers**

Wells Fargo raised objections to opinions from plaintiffs' expert, John A. Rodgers, which were not contained in his written reports.  Specifically, Wells Fargo objects to testimony that he disregarded the appraisals obtained by Bruce's divorce attorneys because the appraisals violated "Regulation 9," and moved to strike that portion of his opinions.  The Court will deny the motion to strike.  Plaintiffs' Rule 26 Amended Expert Rebuttal Report, Plaintiffs' Exhibit 28 for identification only, states the substance of his testimony, although it makes no reference to a "Regulation 9".  Neither the record nor the Court has any idea what "Regulation 9" is, and Mr. Rodgers was unable to provide any citation for such a regulation.  However, since that part of his trial testimony is unsupported, the Court gives it no weight.

**(2) Rule 52(c) Motion**

At the conclusion of plaintiffs' case, Wells Fargo moved for a judgment on partial findings in its favor under Federal Rules of Civil Procedure 52(c). The Court declined to render judgment until the close of the evidence, as permitted by Rule 52(c), and therefore the Court's findings of facts and conclusions of law are made pursuant to Fed. R. Civ. P. 52(a).

**(3) Plaintiffs' Standing To Sue**

In its Rule 52(c) motion, however, Wells Fargo argued for the first time that plaintiffs had not established constitutional standing to bring the claims. The issue of standing, however late in being raised, is a jurisdictional issue which must be addressed.

The constitutional standing principles are well established by the Supreme Court:

> Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const., Art. III, § 2. The doctrine of standing gives meaning to these constitutional limits by identifying those disputes which are appropriately resolved through the judicial process. The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches. To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision.

Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014)
(internal citations and punctuation omitted.)  Thus, plaintiff
"must have suffered or be imminently threatened with a concrete
and particularized 'injury in fact' that is fairly traceable to
the challenged action of the defendant and likely to be redressed
by a favorable judicial decision." Lexmark Intern., Inc. v. Static
Control Components, Inc., 134 S. Ct. 1377, 1386 (2014).  As to the
first prong,

> [a]n injury must be concrete, particularized,
> and actual or imminent; fairly traceable to
> the challenged action; and redressable by a
> favorable ruling.   Although imminence is
> concededly a somewhat elastic concept, it
> cannot be stretched beyond its purpose, which
> is to ensure that the alleged injury is not
> too speculative for Article III purposes—that
> the injury is certainly impending.  Thus, we
> have repeatedly reiterated that threatened
> injury must be certainly impending to
> constitute injury in fact, and that
> allegations of possible future injury are not
> sufficient.

Clapper v. Amnesty Intern. USA, 133 S. Ct. 1138, 1147 (2013)
(internal citations and punctuation omitted.)

Plaintiffs are beneficiaries under the Rosa Trust, but not
all beneficiaries are created equal.  Bruce is the primary
beneficiary, and plaintiffs, while eligible to receive
distributions from the trust, may or may not receive any money
from the Rosa Trust.  During Bruce's life, the Trustee is to pay
income from the principal "to such of my grandson [Bruce] and his

issue as my corporate trustee selects and in such proportion as it determines without being required to maintain equality among my grandson and his issue, . . . ." (Plaintiffs' Exhibit 1, § 3.) The provision continued, stating that "my corporate trustee shall bear in mind, in allocating income from time to time among my grandson and his issues, that after the death of my daughter my grandson will be the primary object of my bounty and that it is my intention that it shall not be charged with an abuse of its discretion should it pay all of the income to my grandson." (Id.)

Additionally, the Rosa Trust allowed the corporate trustee to invade the principal: "To apply for the benefit of a beneficiary, in such manner as my corporate fiduciary deems appropriate, as much of the principal, the income of which it has authority to pay to the beneficiary or to the income of which the beneficiary is entitled, as, without considering the beneficiary's individual property, it determines is required for his comfortable maintenance . . . ." (Id. at § 6(f).) The invasion of principal was restricted after Rose's death: "My corporate trustee shall be similarly guided as to invasion of principal after the death of my daughter and during the life of my grandson should a question then arise as to invasion of principal for the benefit of a beneficiary other than my grandson." (Id.) While Bruce is the primary beneficiary, and has the ability to direct its income and the power to appoint the principal at his death, if he does not do so the

trust will terminate and be paid to his descendants.  Plaintiffs'
Exhibit 4B page 2.

After closing arguments, counsel for Wells Fargo responded to
a question from the Court by stating that she believed none of the
plaintiffs had received distributions from the Rosa Trust.
Plaintiffs have filed a Notice of Supplemental Authority (Doc.
#566) asserting that Plaintiffs' Exhibit 4B establishes that
plaintiffs have received distributions from "all" the trusts,
presumably including the Rosa Trust.  Wells Fargo filed a response
in opposition.  (Doc. #570.)  The exhibit, however, does not
support plaintiffs' position.

The exhibit does indeed state "[w]e are also distributing
funds to your children from these trusts, as they are also
beneficiaries."  Plaintiffs' Exhibit 4B, ¶ 2.  The letter
continues, however, by noting that each of the three children has
his or her own trust, and that "[a]lthough your children are
beneficiaries of other family trusts, it is solely from these
trusts that we make distributions to your children."  Id. page 2.
Additionally, the Court has examined each of the Wachovia Trust
Statements in the record, Plaintiffs' Exhibits 31B, 31C, 31D, 31E,
31F, 31H, 31I, 31J, 139V, 139W, 139X, 140D; Defendant's Exhibits
3, 36, 44, 45, 83, 84, 85, and none of these account statements
reflect distributions to any plaintiff.  By contrast, the one
account statement for the Rose Trust shows distributions to all

plaintiffs.  Defendant's Exhibit 20.  As of January, 2008, Bruce had directed that all Berlinger Trust distributions be made to him.  Plaintiffs' Exhibit 72; Defendant's Exhibit 65.  Thus plaintiffs had an interest in the Rosa Trust and were eligible to receive distributions, but were contingent beneficiaries to whom no distributions have yet been made.

While federal law governs the determination of Article III standing, Florida law may be instructive.  Generally Florida law recognizes that "a trust beneficiary also may sue a trustee for breach of trust".  Weiss v. Courshon, 618 So. 2d 255, 257 (Fla. 3d DCA 1993).  In a variety of circumstances Florida cases have found that a trust beneficiary with only a contingent interest has standing to sue the trustee for mismanagement of the trust resulting in diminution of the trust assets.  Rickard v. McKesson, 774 So. 2d 838 (Fla. 4th DCA 2000); Richardson v. Richardson, 524 So. 2d 1126 (Fla. 5th DCA 1988); Brogdon v. Guardianship of Brogdon, 553 So. 2d 299 (Fla. 1st DCA 1989); Smith v. Bank of Clearwater, 479 So.2d 755 (Fla. 2d DCA 1985).

The Court concludes that plaintiffs have Article III standing.  They have an interest in the Rosa Trust as named beneficiaries who may be entitled to a distribution and will suffer injury if the Rosa Trust is mismanaged or its assets improperly diminished.

**B. Acquisition of Interest in Banyan Property**

Plaintiffs assert that the investment of $2 million from the Rosa Trust in the Banyan Property was not a prudent decision by the corporate Trustee and therefore violated the Florida Prudent Investor Rule.  The Court finds that the evidence establishes the contrary.

The Second Amended Complaint asserts that the Trustee did not act prudently because it paid $2 million for the Banyan Property when it had a fair market value of less than $700,000.  (Doc. #93, ¶¶ 23, 25, 26.)  There was no evidence at trial which would support the proposition that the Banyan Property was worth less than $700,000 at the time of the $2 million investment by the Rosa Trust.  While Wachovia Bank make a clerical error in booking the Banyan Property on the Rosa Trust account statement, that error was corrected without harm to anyone.  Other than this clerical error, there was no evidence which would support that valuation of the Banyan Property.  Even plaintiffs' expert assumed, incorrectly as it turns out, that the fair market value was $4 million.  The Court finds that plaintiffs have not established by any credible evidence that the Trustee's investment decision was imprudent because the value of the Banyan Property was less than $700,000.

At trial plaintiffs argued that the Trustee's investment decision was imprudent because it paid $2 million from the Rosa

Trust for a one-third interest in the Banyan Property when it should have received a one-half interest in the Banyan Property.[5] This proposition depends on the value of the Banyan Property being $4 million, instead of the $6 million Wachovia Bank relied upon.

The only person with any expertise in the valuation of real estate – Mr. Quinby – testified the Banyan Property had a fair market value of over $6 million.  The Court found his testimony credible and his methodology reliable.

Plaintiffs' theory depends upon the testimony of its expert, Mr. Rodgers.  Mr. Rodgers is not qualified to appraise the value of real property, and did not do so in this case.  Mr. Rodgers simply disregarded the appraisals by Mr. Quinby (for reasons the Court finds not to be reasonable or justified), and instead relied upon a simple but flawed approach.  Mr. Rodgers testified that because Sue agreed to convey her undivided half interest in the Banyan Property to Bruce for $2 million as part of the MSA, the fair market value of the whole property must be $4 million.  In light of that, Mr. Rodgers opined, the Trustee should have obtained a 50% interest in the Banyan Property, not a 33% interest.

The record is clear that the $2 million agreed amount was never intended to reflect 50% of the fair market value of the

---

[5] The Court overrules defendant's objections that this theory of the case was not fairly presented in the Second Amended Complaint.

Banyan Property, and that it was clearly not arrived at between willing and able parties in an arms-length transaction.  The $2 million payment was the amount needed as a matter of equity to "equalize" the result of the agreed-upon distribution of other marital assets.  The amount would rise or fall based on the division of the other assets, not based upon an attempt to place a fair market value on the property.

The Court finds that plaintiffs have not established that Wells Fargo breached the Florida prudent investor rule, or any of its fiduciary duties, when it invested $2 million from the Rosa Trust in the Banyan Property.

## D. Capital Improvements

Plaintiffs also assert that Wells Fargo acted imprudently when it used principal from the Rosa Trust to make capital improvements to the Banyan Property.  Under the facts of this case, the Court finds otherwise.

The Second Amended Complaint asserts that on or before January 2008, Wachovia Bank authorized the payment from principal in the amount of $167,615 for the purpose of making capital improvements to Banyan Property.  (Doc. #93, ¶ 23.)  According to plaintiffs' such action constituted a distribution of principal instead of income in violation of the terms of the Trust.  (Id.)

The record shows that initially it was Bruce who entered into a contract with Cabral Construction to make capital improvements

on the Banyan Property.  Plaintiffs' Exhibit 137; Defendant's Exhibit 55.  Wachovia Bank first heard of the construction at the Banyan Property in December, 2007 after Bruce had already made the agreement.  Plaintiffs' Exhibit 137; Defendant's Exhibit 55.  Bruce informed Wachovia Bank on December 21, 2007, that he was getting the Banyan Property "'designer ready' for sale."  Defendant's Exhibit 56.

Ultimately, Wachovia Bank entered into a contract with Cabral Construction for the $250,000 improvements.  Plaintiffs' Exhibit 124C.  The purpose of the improvements was to increase the property's overall sales value.  (Id.)  Wachovia Bank discussed whether the Rosa Trust would be reimbursed for the cost of the improvements if the home was sold and Bruce agreed that two-thirds of the costs would be credited back to the Rosa Trust when the Banyan Property sold.  (Id.); Plaintiffs' Exhibit 137.  The total cost of the improvements paid by Wachovia Bank from the Rosa Trust to Cabral Construction was $286,632.00.  Plaintiffs' Exhibits 139X, 31C, 31E, 31F, 140D.

The Court agrees with the testimony of defendant's expert William C. Reis.  Under the facts and circumstances of this case, the use of the funds from the Rosa Trust for capital improvements to the Banyan Property was reasonable in light of the investment made in the property, the need for the improvements, and the agreement that the Rosa Trust would receive its fair share upon

sale of the Banyan Property.  The Court finds that plaintiffs have not established that Wells Fargo breached the Florida prudent investor rule, or any of its fiduciary duties, when it invested funds from the Rosa Trust for capital improvements in the Banyan Property.

Accordingly, it is now

**ORDERED:**

1.   The Court finds that plaintiffs have failed to establish by a preponderance of the evidence that Wells Fargo, N.A. breached any of its fiduciary duties to plaintiffs in connection with the investment of funds from the Rosa Trust in the Banyan Property. Judgment will therefore be entered in favor of defendant Wells Fargo, N.A. and against plaintiffs Stacey Sue Berlinger, Brian Bruce Berlinger, and Heather Anne Berlinger as to the remaining portions of Counts I and II.

2.   Judgment shall enter in favor of defendant Wells Fargo, N.A. and against plaintiffs Stacey Sue Berlinger, Brian Bruce Berlinger, and Heather Anne Berlinger as to those portions of Counts I and II upon which summary judgement was granted in the prior Opinion and Order (Doc. #492) and as to Count III pursuant to the dismissal in the prior Opinion and Order (Doc. #220).

3.    The Clerk of Court's is directed to terminate all remaining deadlines and close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this  25th  day of February, 2016.

_____
JOHN E. STEELE
SENIOR UNITED STATES DISTRICT JUDGE

Copies: Counsel of record

40